James Paul DANIEL *v.* Patsy Marie DANIEL

5-4561

428 S. W. 2d 73

Opinion delivered May 21, 1968

*Penix & Penix,* for appellant.

*Marcus F. Fietz* and *Arthur L. Adams,* for appellee.

Carleton Harris, Chief Justice. This is a child custody case. Appellant, James Paul Daniel, 22 years of age, is a member of the United States Air Force. He was married in 1962 to appellee, Patsy Marie Daniel, at a time when he was 17 years of age, and she was 16. When barely 18, appellant joined the Air Force, and has been in the service since that time. Two little girls were born to the marriage, Paula Marie, 4 years of age, and Pamela Sue, 2 years of age. In July, 1966, Daniel was sent to Vietnam, where he was stationed until the last of April, 1967. In December, 1966, according to the evidence, appellant ceased receiving mail from his wife, but after a month, he received a letter from her asking for a divorce. James was told by Patsy, according to his evidence, that she loved another man. Subsequently,

appellant filed an action, seeking a divorce and custody of the children, but later withdrew the petition for divorce, and confined his suit to a prayer for custody of the little girls. His wife filed a counter-claim for divorce, custody of the children, and support and alimony. After hearing evidence, the court denied a divorce to appellee, but held that appellant had failed to show that his wife was unfit to have custody of the minor children, and such custody was awarded to Patsy. The court further directed that the sum of $125.00 per month be paid for child support. From the decree so entered, appellant brings this appeal.[1] For reversal, it is first asserted that Mr. Daniel should have been awarded custody of the children, and it is also argued that the amount awarded for support was excessive.

After a close study of the record, we have reached the conclusion that the Chancellor's findings should not be disturbed. Appellant testified that, when he, by virtue of his military duties, had to leave his wife, a mobile home which had been purchased by the parties was left parked at her mother's house, the monthly payments being $60.75 . . . a 1962 Comet automobile was also left with her. He said that, after being in the service two months, he made an allotment, and after going to Vietnam, he sent her practically all of his money, except about $10 a month; that this, for some period of time, amounted to about $500.00 per month. The witness stated that, when he reenlisted in August, 1966, he received a bonus, and sent her $850.00, but that, despite receiving these amounts of money, the mobile home had been lost due to her failure to make payments. Appellant testified that, after returning home, he went to his wife's apartment, knocked on the door, and a man, J. C. Foreman, came to the door; that the two little girls were standing in the apartment, calling the man "Daddy." Daniel said that the door was slammed in his face, but,

---

[1]Appellee gave notice of a cross-appeal, but same has apparently been abandoned, since, in her brief, she urges that the decree should be affirmed.

after his continual knocking, it was opened again, and the man said that he was a repairman. Appellant is presently stationed at the Larado Air Force Base, and he testified that he was applying for a transfer to the Blytheville Air Base; that, if the transfer is approved, he will be able to go to Cash, where he will live with his parents, after finishing his regular work day at Blytheville. He desires that the custody of the children be given to him, and he stated that his parents would keep the children. Daniel said that, despite all that had happened, he would still be willing to talk with his wife about a reconciliation.

Grover Gent testified that he was the employer of a man named J. C. Foreman (who had worked for him for two months), and that Patsy Marie Daniel would generally bring Foreman to work. He said that she regularly would pick Foreman up when he finished his work about 11:00 P.M. W. E. Cooksey, manager of an apartment house in Jonesboro, rented appellee an apartment, and he said that Mrs. Daniel informed him that she had a husband and two children, and that her husband worked at Berry's truck shop.

A brother and brother-in-law of appellant testified that they had observed Patsy in the car with J. C. Foreman, appellee having her arms around Foreman. The brother-in-law stated that appellee was a messy housekeeper, and that the children were not taken care of: "Their clothes was dirty, their faces was dirty and their hair wasn't combed, and dirty dishes setting around, setting on the floor." His wife agreed with this testimony, and said that the children were not properly dressed in the winter. She also said that appellee spent all afternoon with a "preacher." Appellant's mother, 51 years of age, and father, 67 years of age, testified that they owned a farm near Cash, had plenty of room to keep the children, and would be glad to do so. Both testified that their daughter-in-law neglected the children.

Appellee testified that it had been necessary for her to work at various times after her marriage to appellant; that she worked at the sandwich department at the base, and worked at a drive-in as a car hop. According to her testimony, she turned all checks over to her husband, prior to his going overseas. The witness stated that the trailer was repossessed after she had gone to Little Rock to try and find work.[2] According to Patsy, the couple had become heavily involved in debt, because of purchases made, including the automobile, and $800.00 worth of furniture. She said that most of the money was spent in paying debts, including payments to the bank for money which her husband had borrowed. She denied that she did not care for the children properly, denied that she had an affair with the minister heretofore referred to, and denied that she had had improper relations with Foreman. She said that her husband had accused her of being intimate with several men; that he mistreated the children, having whipped them with a leather belt.[3] Patsy's mother, Mrs. Simms Decker, during a period when her daughter was working, kept the children from the last of December, 1966, until May, 1967.

Counsel for appellant urges that we give this case a real *de novo* hearing, and suggests that, all too often, we rely upon the findings of the trial court, commenting that the Chancellor had the opportunity to observe the litigants, and that we will not reverse his findings unless they are clearly against the preponderance of the evidence. Counsel is correct in stating that we do rely, in large measure, upon the findings of the trial court, and we are convinced that this is the better practice; though it is repetitious, we do think that the trial court is in a better position to render fact findings than this court, and we have commented that this is particularly

---

[2]She was subsequently employed at Dobbs House in Little Rock.

[3]Appellant testified, "I may have lightly, but I didn't beat them."

true in a child custody case. In *Wilson* v. *Wilson*, 228 Ark. 789, 310 S. W. 2d 500, we said:

"* * * The Chancellor saw and heard the witnesses, and all the parties to the litigation, and evidently saw the child, as the testimony reflects she was present. We know of no type of case wherein the personal observations of the court mean more than in a child custody case. The trial judge had an opportunity that we do not have, *i. e.*, to observe these litigants and determine from their manner, as well as their testimony, their apparent interest and affection, or lack of affection for the child."

There can be no entirely satisfactory conclusion of a contested child custody case. We, of course, are prone to be sympathetic with the position of the appellant, who is serving his country, and has been in Vietnam, and it does appear that his wife has not spent her time grieving over his absence. However, it is noticeable that there is no evidence of appellee drinking, carousing, or frequenting undesirable places. Likewise, there is no actual evidence of adultery between appellee and Foreman, though he seems to have had a close association with appellee; the Chancellor, we think stated it correctly, when he said:

"Gentlemen, it is just this simple. She had a complaint for a divorce on the grounds of general indignities on his part and she has utterly failed to show anything at all. Any claim of infidelity, she denies, but there is sufficient conduct to put a reasonable person on notice that she might be guilty of it. I will have to deny her divorce and I will give her custody of the children. There is no showing that she is not a fit and proper person to have custody of the children and that will be my decree."

It will also be observed that the evidence was not entirely one-sided, though there is no testimony that would indicate that appellant was guilty of intimate

relations with other women. At any rate, whatever our thoughts in the matter, the fact remains that this court has, many times, said that children of tender years will not be taken from a mother solely because of her infidelity to the husband. *Harris* v. *Gillihan,* 226 Ark. 19, 287 S. W. 2d 569, and cases cited therein.

We have many times said (in fact, so many that a citation of authority is unnecessary) that the paramount consideration in child custody cases must always be the welfare of the child. In taking this rule as the guiding star, we cannot say that the court was wrong in awarding custody of the little girls to their mother. Appellant's mother is 51 years of age, and his father is 67, and appellant himself did not seem to feel that his mother was a proper person to have the custody of the children. This is evidenced by the fact that appellant wrote a will just before he went to Vietnam providing that if anything happened to him and his wife, appellee's mother was to have the care of the two children. He also admitted that he had, both by mail, and in talking to his wife, stated that his mother was not the proper one to have custody of the two little girls, though he said that this was based on the fact that his wife "told me about some things that my parents done." It might also be added that, though appellant states that if he or his parents be given custody of the children, he would apply for a transfer to the Blytheville base, there is no assurance that the transfer would be granted.

It is also argued that the award of $125.00 per month is excessive. Let it be remembered that this money is not being paid for the benefit of the wife, but rather the decree makes it plain that the amount is for child support. With living costs mounting each day, we are unable to agree with appellant that this amount is excessive. It also appears that $105.00 of this sum will be paid by an allotment from the government, that amount being provided for children. It thus appears that appellant will actually be called upon to pay only $20.00.

Of course, under a change of circumstances, appellant can always move to modify the provisions of the decree.

Appellee's counsel is allowed an additional fee of $100.00 for services in connection with this appeal.

Affirmed.