

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-248

| | |
|---|---|
| JOSHUA CHASE | **Opinion Delivered** September 11, 2013 |
| APPELLANT | |
| V. | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. JV-2011-87-6] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES and H.C. and K.C., MINORS | HONORABLE EARNEST E. BROWN, JR., JUDGE |
| APPELLEES | REVERSED AND REMANDED |

## ROBERT J. GLADWIN, Chief Judge

Joshua Chase brings this second appeal from the Jefferson County Circuit Court's order on remand awarding custody of Chase's two children, H.C. (dob 9-11-08) and K.C. (dob 9-15-09), to the maternal grandparents, intervenors David and Cheryl Collins. We reverse and remand for custody to be immediately transferred to appellant Chase.

*August 12, 2011 Custody Order*

Chase successfully appealed the circuit court's August 12, 2011 custody order, which awarded custody to the Collinses and granted liberal visitation to Chase. *Chase v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 311, ___ S.W.3d ___ (*Chase I*).[1] In *Chase I*, this court reversed and remanded to the circuit court based on Chase's argument that the evidence was

---

[1]For an in-depth procedural history of the case, as well as a summary of the evidence before the circuit court prior to the August 12, 2011 order, see *Chase I*.

insufficient, holding that the grant of permanent custody to the Collinses was clearly erroneous. *Id*. at 17, ___ S.W.3d at ___. This court explained that

> all of [Chase's] accomplishments since DHS's involvement demonstrate that the children's health and safety would not be at risk if they were placed in [Chase's] custody and would preserve and strengthen the family ties. However, we also acknowledge that several months have now passed since the trial court's award of permanent custody to the Collinses, and that we are not privy to anything that may have occurred during this interim time. . . . We reverse and remand for the trial court to reinstate temporary custody while DHS provides the normal array of services to [Chase] in order to determine if he can be a proper and adequate parent.

*Id*.

### Case on Remand

On June 21, 2012, the circuit court filed an order of temporary custody following a hearing on remand held May 17, 2012. The circuit court erroneously interpreted this court's opinion to mean that the case would begin anew and both parents would again be considered as potential custodians, even though the children's mother, Mildred Chase, had been declared unfit in its August 12, 2011 custody order, and Mildred Chase did not appeal.

On August 6, 2012, the Collinses filed a citation for contempt alleging that Chase had not paid child support on a regular basis since June 29, 2012, and was in arrears $385. Chase responded by admitting an arrearage, but stating affirmatively that, pursuant to the original order for permanent custody, his child support should be reduced by fifty percent any time he had the children with him for more than fifteen days. Chase stated that, as of the filing of his response on August 17, 2012, he had paid the full amount that was alleged to be owed and sought a credit for the fifty-percent reduction for the visitation he enjoyed in June and July 2012.



On August 7, 2012, Chase filed an emergency petition for a writ of certiorari in the Arkansas Supreme Court alleging that the circuit court had exceeded the bounds of its jurisdiction by failing to follow this court's remand instructions to immediately reassess whether Chase continued to be a proper parent to take custody of his children. Chase further alleged that Mildred Chase was improperly allowed to enter the case and compete for the custody of the children. Our supreme court granted Chase's petition for writ of certiorari as to the order to restart the case from the beginning and the order to reopen the case as to all issues and parties whose matters were closed and not appealed.

On September 6, 2012, the circuit court filed an order of contempt, finding that Chase had been admonished to pay his child support, in a timely manner, had a history of sporadic payments of his child support, and had willfully and intentionally violated the circuit court's order. Chase was ordered to follow the court's order with regard to child-support payments in the future and to pay $300 to the Collinses' attorney.

*Final Hearing*

On November 6, 2012, a permanency-planning hearing was held that, despite the writ of certiorari that had been granted, included Mildred Chase, who had filed a motion for visitation. Soren Louvring, a medical doctor at the Winston Clinic in Sheridan, Arkansas, testified that H.C. was his patient and that he had examined H.C. on September 11, 2012, when the Collinses brought him in for a routine examination regarding a runny nose and cough. Dr. Louvring explained that the Collinses told him that the bruise on H.C.'s right calf was caused by H.C.'s father kicking him. He described the bruise as a very minor,

3

transient injury. He also said that he did not feel compelled to call the child-abuse hotline. He explained further that the Collinses had told him of the custody battle and that they had made DHS aware of the allegation, but simply wanted the doctor to acknowledge the bruise.

Yolanda Warrior testified that she was employed at United Family Services, but was the DHS case worker for the Chase children. She explained that the Collinses had given her information regarding H.C.'s wiping feces on the wall and Chase's allegedly hitting K.C. on the shoulder. K.C., age two, at the prompting of Mrs. Collins, demonstrated how Chase had allegedly hit her. Ms. Warrior testified that Mildred Chase contacted her about H.C.'s bruise.

Kay Kimbrough, a clinical therapist, testified that H.C. was her client and that she began seeing him in May 2012, and that H.C., who was age three, expressed concerns about visitation with his father. She said that H.C. was adamant about not wanting to visit his father. On cross-examination, Ms. Kimbrough stated that H.C.'s anxiety came from fear of leaving his grandparents, not from abuse. She then stated, "I think it probably is a little bit of both." She explained that she knew the Collinses from teaching them a class in foster parenting and from performing their home study in their home. She said that when H.C. began having issues, the Collinses called her. She diagnosed H.C. with adjustment-disorder anxiety, which, she said, is treated by removing the source of the anxiety, which is the separation of H.C. from his grandparents. She testified that she was not concerned about whether H.C. was coached by the grandparents, as she was not trying to determine that, but she was concerned for H.C.'s anxiety, and that she had to trust the Collinses. She opined

that disrupting H.C.'s life by a change in custody would be detrimental. Finally, she said that she had never met Chase, H.C.'s father.

David Collins testified that the children had been in his home for two years and nine months. He said that H.C. would smear feces on the wall and urinate on the floor when it was time to visit his father. He said that H.C. would not talk to his father on the phone. He claimed that Chase would be "under the influence of alcohol" during phone visitations and that he determined this by listening to Chase's slurred speech. He said that, while on speaker phone, Chase just quit talking at one point; however, Mr. Collins could not remember when the phone call occurred, but that it was sometime "last year." Mr. Collins claimed that H.C. had been soiling and wetting the bed for over a year and that the behavior was getting worse. He testified that his wife photographed H.C.'s bruise after a visit with Chase. He further testified that he had problems getting child support "as ordered."

On cross-examination, Mr. Collins testified that his daughter, Mildred, had supervised visitation and was not alone with the children. He said that she could come over to his house any time as long as it was supervised.

Cheryl Collins testified that Chase did not make regular child-support payment, but she said that he was current on the payments. She complained that he sent a partial payment one month and then paid the balance later. She admitted that she did not allow Chase to visit with the children the day before the hearing and that she did not allow visitation on another occasion because H.C. begged her not to let Chase come by the house. She explained that K.C. complained of her arm hurting and that her daddy had hurt her. Mrs.

Collins took K.C. to Arkansas Children's Hospital and the Winston Clinic, but neither would do an x-ray on a small child. She said the doctor at the Winston Clinic said it was probably just a pulled muscle. She admitted that no one thought it was abuse or called the hotline. She said, "We tried to get them to x-ray it, but they didn't think it was abuse."

H.C., at age four, said, "Yes," when asked if his daddy kicked him. He also said that his daddy shoved his sister, then stated that he "rubbed K.C.'s shoulder." He said that his daddy is mean because he "kicks us and everything." He said that he wanted to stay with his Nanny and Papa. On cross-examination, he denied doing anything when he visited his father in Ohio, but later admitted that he had been to the fair and had gone fishing with his dad, as well as church. When asked if anyone told him to say that his daddy hit him, he replied, "Yes," and said his Nanny told him to say it. He also said that his Nanny told K.C. to say that their daddy hit her. At the conclusion of H.C.'s testimony, Chase moved for a directed verdict, and the trial court denied the motion.

Ollie Merritt testified that he was an advocate supervisor for Voices for Children, CASA, in Jefferson County. He testified that CASA in Ohio visited Chase's home while the children were visiting. There were no concerns on the report from that interview, and he noted that both children seemed perfectly at ease in their father's presence. He stated that Chase had medical insurance for the children, had adequate space in the home, and that there was an approved home study.

LaTisha Young, the DHS caseworker, testified that the case plan for Chase was to have his visitation as set out in the court order, have a safe home environment, pay child

support, have clean drug screens, complete a drug-and-alcohol assessment, and complete a psychological evaluation. She explained that he completed these tasks and that the assessment resulted in no treatment for drug or alcohol abuse. She testified that Chase was negative for all substances in the drug screens given. She also said that Chase obtained parenting classes on his own in Ohio and had maintained stable employment and housing. She recommended that custody be given to Chase, opining that the children were not school age and there would be no disruption in their school.

Marsha Chase, paternal grandmother, testified that her son lives in her home and that he was a wonderful father. She testified that the children would share a room, but that each would have his or her own bed. She said that H.C. cried at visitation exchanges when the Collinses were present, but after traveling about a block, he was okay. She said that when the children would return to Arkansas, H.C. began to act out. Mrs. Chase testified that she kept the children while their father worked, from 6:00 a.m. until 2:00 p.m.

Appellant Joshua Chase testified that he had another daughter, R.C., who lived in Ohio with her mother and visited him on a regular basis. Chase claimed that he had joint custody of the child and that she was very close with H.C. and K.C. He denied ever kicking or hitting his children. He testified about his concerns for H.C., developmentally and socially. He also said that K.C. had swallowing issues and that he did not know if the recommended study related to that had been performed. He expressed concern over K.C.'s foot, which was "pronating." He bought her shoes to correct the issue, but claimed that she normally wore flip flops. He testified that he had not used a controlled substance since

December 23, 2010, and that he does not drink. He explained that he had taken medication and fallen asleep during the phone call that David Collins described. He said that he completed twenty-five hours of parenting classes, is continuing the classes, and that they have helped him cope with K.C.'s tantrums and disciplining in general.

On cross-examination, Chase could not explain the discrepancies in his payment history provided by his employer and the affidavits of financial means.[2] On redirect, he stated that $300 per week is his average pay, that he had provided numerous pay stubs, and that he did not lie to the court.

*November 6, 2012 Custody Order*

By order dated November 6, 2012, the circuit court again awarded custody to the Collinses and granted liberal visitation to Chase. The order recites the testimony elicited at trial and finds as follows:

> After hearing the testimony, and especially the cross-examination of the Defendant Joshua Chase, the Court found this testimony to be compelling. The Court had previously, in its discretion, permitted a substantial deviation from the child support chart and reduced the child support based upon the Affidavit submitted by Mr. Chase and presented in sworn testimony in at least two prior hearings. The Court finds Joshua Chase's testimony greatly lacking in credibility.

> It is within the sole discretion of the Court to determine the truthfulness of a person's testimony as well as their ability to pay. The Court finds Mr. Chase to be substantially lacking in credibility with the Court.

> Therefore, the Court, in reviewing the evidence and testimony as a whole, finds that the actions of the Defendant Joshua Chase, with regard to the kicking of the

---

[2]During his ruling from the bench, the circuit judge noted that one affidavit, which was attached to interrogatories, listed $321 for Chase's weekly take-home pay. Another affidavit, filed September 6, 2012, indicated $333.58 as Chase's weekly take-home pay.

SLIP OPINION



child, the assertions of his use of alcohol, and his very sporadic child support payment history causes this Court to find that he is not a fit and proper parent for the minor children, [H.C. and K.C.].

The circuit court granted the same liberal visitation order for Chase as was contained in the original order, providing that the Collinses transport the children halfway during visitations, and maintained child support as previously awarded.

Chase filed this appeal in a timely manner and argues that the circuit court erred, claiming that each of the bases of the circuit court's decision was insufficient to award custody to the maternal grandparents over their father and claiming that, under this court's prior mandate, Chase is now entitled to custody of his children. We agree.

*Standard of Review*

Juvenile proceedings are equitable in nature; therefore, our standard of review on appeal is de novo. *Rose v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 668. However, the circuit court's findings of fact are not reversed unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.*

*Discussion*

The Collinses contend that the circuit court did not err and urge this court to give special deference to the superior position of the circuit court in evaluating the witnesses, their testimony, and the children's best interest. *Gantt v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 217; *Furr v. James*, 2013 Ark. App. 181, ___ S.W.3d ___. The Collinses claim that the

SLIP OPINION

preference for natural parents to regain custody of their children is found in the Juvenile Code only in relation to permanency-planning hearings. Ark. Code Ann. §9-27-338(c) (Supp. 2011). Thus, they argue that the preference does not apply because this was not a permanency-planning hearing. We disagree. This court has previously determined that Chase is entitled to the preference given natural parents. *See Chase I*, *supra*.

The Collinses argue alternatively that if section 9-27-338 applies, then the preferential language is governed by the phrase, ". . . if it is in the best interest of the juvenile and the juvenile's health and safety can be adequately safeguarded if returned home." They distinguish *Devine v. Martens*, 371 Ark. 60, 263 S.W.3d 515 (2007), which was cited for the argument that preference for the natural parent must govern until it is established that the natural parent is unfit, by pointing out that *Devine* was a probate matter that was only "akin to issues that typically arise in dependency-neglect cases," but not finding that it was a dependency-neglect case.

In *Devine*, our supreme court stated,

> In our review, it is clear that Devine took significant action toward rectifying any issues that would keep her from retaining custody of her son. These are the very types of improvements that parents are encouraged to make in the best interests of their child or children, and Devine should not be disparaged for her efforts to improve her home and her parenting skills. Specifically, if, instead of the Martenses filing for guardianship of Syris, a dependency-neglect action had been instituted in this case, Devine would now be reunited with her son. She has already done everything that would have been asked of her. She has corrected every problem about which the circuit court expressed concern. It is true that she has done so because of the threat that her child might be removed from her custody, but such a motive is entirely appropriate when a parent is working toward reunification with his or her child.

*Devine*, *supra*, at 74, 263 S.W.3d at 526. The reasoning above is applicable to Chase.

The Collinses argue that a review of the evidence shows that substantial evidence proved that Chase's actions presented safety and personal-harm issues to the children. They claim that the evidence was clear that Chase struck his children; consumed alcohol while talking with his children on the telephone; did not carry out his child-support obligations; and lacked truthfulness concerning his child-support payments, income, and his mental-health history. They urge this court to follow *Gantt*, *supra*, and *Fletcher v. Scorza*, 2010 Ark. 64, 359 S.W.3d 413. Both are guardianship cases and apply our supreme court's reasoning that there is no fitness or unfitness requirement involving the natural-parent preference of Arkansas Code Annotated section 28-65-204(a) (Repl. 2012). In both of these guardianship cases, the best interest of the children prevailed.

The Collinses claim that the same logic was applied here, and the circuit court specifically focused on what it considered to be the best interest of the children. Therefore, they assert that the award of custody to them was not clearly erroneous. They argue that Chase did not fulfill all the case-plan requirements. They acknowledge that CASA approved his home in Ohio, but point out that he lives with his parents and has not had a home of his own in the past three years. They contend that there is no substantial evidence that they tried to alienate him from the children and argue that even though H.C. testified that his grandmother told him and his sister to say that their dad had hit them, he also testified that their dad hit had him them. Therefore, they argue that the circuit court found credible the testimony that the dad had struck the children and that it should be upheld.

The Collinses emphasize that the circuit court heard evidence about Chase's slurred speech and passing out during a phone call; H.C.'s testimony that his father kicked him; the therapist's testimony that H.C. told her that his father kicked him and hit his sister's arm; and the caseworker's testimony that she was told by the children that their father struck them. The Collinses argue that the contempt order against Chase for his failure to pay child support bolsters the circuit court's decision. Finally, the Collinses contend that the circuit court made a credibility determination in finding that Chase had an issue with the use of alcohol and that their own testimony regarding Chase's slurred speech and his passing out while on the telephone with the children supports the circuit court's decision.

They also argue that the circuit court's finding that Chase lacked credibility was supported by the evidence of conflicting medical histories and a variance between Chase's testimony and affidavits of financial means regarding his income. They claim that the evidence is quite strong that Chase has not changed, has digressed, and does not offer to either of these children a safe home environment. They contend that the children have been with them for nearly their entire lives and the circuit court's decision was based on the best interests of the children.

It is well settled that our law establishes a preference for the natural parent in third-party custody cases and that preference must prevail unless it is established that the natural parent is unfit. *Mahone v. Ark. Dep't of Human Servs.*, 2011 Ark. 370, 383 S.W.3d 854; *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Robbins v. State*, 80 Ark. App. 204, 92 S.W.3d 707 (2002); *Devine*, *supra.* We held in *Chase I* that Chase fell within the first

preference category of Arkansas Code Annotated section 9-27-338(c)(1) (Supp. 2011), which returns the child to a fit parent if it is in the best interest of the child and the child's health and safety can be adequately safeguarded if returned home. We stated that the Collinses' interest fell within the fifth preference, which authorizes a plan to obtain a permanent custodian, including permanent custody with a fit and willing relative. Ark. Code Ann. § 9-27-338(c)(5).

Rather than granting Chase custody because none of his circumstances had deteriorated since the first appeal, the circuit court ordered DHS to provide him with reunification services. The circuit court's finding of unfitness was based on Chase's late child-support payments and the disparity on the income listed on the affidavits of financial means that had been filed over the two years of the case. Although these figures represented only a twelve-.dollar difference and were explained as being the result of a variation in payroll deductions at the time Chase filled out the affidavits, the circuit court believed the figures to be so dissimilar that it labeled Chase as "untruthful" and, therefore, not credible. The order states that he is unfit because of his "sporadic child support history," his "use of alcohol," and an allegation that he "kick[ed] the child."

In his brief, Chase recites the history of his child-support obligation, acknowledges the contempt order against him, and explains that he made two payments in October 2012 because he had to pay the $300 contempt fine that month. He contends that it is inconceivable that the circuit court could find him unfit and untruthful because of a twelve-dollar difference between an earlier affidavit and pay stubs. He insists that the affidavit filed

13

on September 6, 2012, matched the pay stubs entered as evidence at the hearing. Thus, he contends that there is no evidence to demonstrate that he failed in any regard in relation to child support, and the circuit court's decision was clearly erroneous.

He next addresses the circuit court's finding regarding his use of alcohol. Chase contends that the only evidence of record was an allegation by David Collins, who testified that Chase seemed to be under the influence of alcohol during phone visitations and that he had slurred speech. Chase admitted to falling asleep during a phone visitation because he had been sick and had taken medication. Further, he points to the completed drug-and-alcohol assessment, where no treatment was recommended. Other than the allegation by Mr. Collins and the assessment that concluded Chase did not have an alcohol problem, the record is devoid of any issue regarding alcohol.

Finally, Chase contends that the Collinses alleged physical abuse in order to retain custody. He points to Mrs. Collins's testimony that she took K.C. from doctor to doctor trying to get an x-ray and a hotline report. Further, the doctor who examined H.C. did not consider the bruise to be the result of child abuse, but stated that it could have been caused by any number of things, describing it as minor. Chase maintains that the Collinses took H.C. to a therapist in order to alienate Chase from his children. He asserts that the Collinses began making case-altering allegations against him that they had not made prior to the remand order. He recaps the testimony by Yolanda Warrior, who said that the children were fine after visitation with their father and that Cheryl Collins had reported to her that H.C. had been kicked by Chase. She also told of Cheryl Collins's prompting of K.C. to

14

demonstrate how Chase had hit her. Chase cites Mrs. Collins's testimony that she denied him visits on two specific occasions when he was in town and his own testimony that he had problems communicating with the Collinses. Last, Chase contends that H.C.'s unequivocal testimony that his grandmother told him to say that his dad hit him and that she told K.C. to say that her dad hit her was the most egregious evidence demonstrating the Collinses' alienation.

DHS and the attorney ad litem filed a joint appellate brief arguing that there was insufficient evidence to support an award of permanent custody to the Collinses. They adopt Chase's arguments above and further argue that the circuit court failed to comply with the statutory requirements regarding a grant of permanent custody. We do not address the statutory argument because we hold that the circuit court's award was clearly erroneous.

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Rose, supra.* This court holds that a mistake has been made based on the evidence presented. We agree that it is inconceivable that the circuit court could find Chase unfit and untruthful because of a twelve-dollar difference between an earlier affidavit and pay stubs. The circuit judge noted while ruling from the bench that the testimony regarding the take-home pay swayed his decision. However, in its order awarding custody to the Collinses, the circuit court did not change Chase's child-support obligation. Further, even though there was evidence in the record regarding use of alcohol and allegations of "kicking" his child, visitation awarded to Chase was not limited. In reviewing the entirety



of the evidence, the bases for the circuit court's order do not support the circuit court's refusal to award custody to Chase.

Reversed and remanded.

WALMSLEY and HARRISON, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Tabitha B. McNulty*, County Legal Operations, for appellee Arkansas Department of Human Services.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.